## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

Gianni-Paolo Ferrari,

                Plaintiff,      Case No. 13-cv-14857

                                      Hon. Judith E. Levy

v.                            Mag. Judge Michael J. Hluchaniuk

Ford Motor Company,

                Defendant.

_____/

## OPINION AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [33]

This is an employment discrimination case. Pending is defendant Ford Motor Company's motion for summary judgment. (Dkt. 33.)

I.      Background

Plaintiff has been an employee of Ford Motor Company since 1996, and a member of the United Auto Workers ("UAW") for the duration of his employment. In 2000, while on the job, plaintiff suffered a neck injury that substantially limited him in a number of major life activities. He continued to work at Ford with accommodations that

have varied based on the severity and impact of the pain originating from his neck injury.

In January of 2012, plaintiff was working in defendant's human resources department, a placement he obtained as a reasonable accommodation for his neck injury. At that time, plaintiff was certified for his most recent Family Medical Leave Act ("FMLA") leave, originating from psychological issues related to his work relationship with a supervisor. (Dkt. 36-2 at 19.) By late 2012, plaintiff's treating physician agreed that his neck pain had improved to the extent that he no longer needed permanent restrictions or accommodations.

On December 3, 2012, plaintiff met with Dr. Athelia Brewer, defendant's company doctor, to be cleared to return from his FMLA leave. Plaintiff brought with him notes from his treating physicians stating that his neck-related restrictions were no longer required. Plaintiff states that he requested that his restrictions be lifted in order to apply for a potential skilled trades position. (*See* Dkt. 37-1.) On December 6, 2012, Dr. Brewer imposed restrictions of "no overhead work" and "no climbing ladders," along with two other restrictions. (Dkt. 37-6.)

On December 17, 2012, defendant informed plaintiff that there was an opening for a refrigeration maintenance skilled trades position ("RMI tradesman" or "RMI position") at the Van Dyke plant, and that plaintiff was next on the seniority list.   Based on the collective bargaining agreement between defendant and the UAW, the most senior qualified person for particular skilled trade jobs, including the position at issue here, would receive the position if interested.   The position also came with higher compensation than normal production work.

On January 16, 2013, following the announcement of the RMI opening, plaintiff went back to Dr. Brewer so she could conduct a mandatory physical.   Plaintiff brought with him a variety of clearances from other doctors and examiners, all related to his prior neck injury. Among the documentation was a January 7, 2013 chart entry by his family physician, Dr. David Calton, that stated plaintiff was still actively using Kadian (an extended-release morphine sulfate drug) and Valium.  (Dkt. 33-8 at 5.)

Dr. Brewer did not clear plaintiff for the job, and instead sought clarification from plaintiff's treating physician, Dr. Kole, regarding both

the removal of the neck-related physical restrictions and plaintiff's use of Valium and morphine. (Dkt. 37-7 at 3.) Dr. Brewer also sought a job description in conjunction with plaintiff's request for clearance. (Id.) Dr. Brewer discussed the overhead-work and ladder-climbing restrictions with Tom Ternan, the RMI supervisor. (Dkt. 36-9 at 4.)

Dr. Brewer then sent plaintiff for an independent medical examination ("IME"), conducted by Dr. Philip Friedman, a neurosurgeon. The IME report stated that plaintiff had no physical restrictions, but that as a result of plaintiff's continued dependence on opioids such as morphine Dr. Friedman would not allow plaintiff to resume unrestricted employment. The IME did not suggest any specific restrictions for plaintiff. Following Dr. Friedman's IME, defendant also sent a letter to Dr. Kole, asking how long it would take to wean plaintiff off of opioids. Dr. Kole responded on February 7, 2013, that plaintiff could physically perform the duties in the RMI position description, but would require three months to be weaned off of his pain medications. (Dkt. 36-15.)

Plaintiff contends that he had weaned himself off of opioids as of December 2012. Defendant states that plaintiff told Dr. Brewer on

4

January 16, 2013 that he had not used opioids for over a month, and that he told Dr. Friedman on January 29, 2013 that he had not used opioids for over three months. His last prescription for opioids from Dr. Kole was filled on December 19, 2012, and Dr. Kole states that plaintiff brought the drugs back to him unopened on May 22, 2013. (Dkt. 36-11 at 3.)

Starting on February 13, 2013, plaintiff requested his medical file. (Dkt. 36-17 at 6.) On February 26, 2013, management employee Linda Beggs, in an e-mail to another management employee, stated that Dr. Brewer would "wait until closer to the 15 day period to provide it to [plaintiff] as [Dr. Brewer] expects he will immediately ask his personal physician to take him off the prescriptions medications [*sic*] so he won't have any current restrictions." (Dkt. 36-17 at 2.)

On February 27, 2013, Dr. Brewer removed two of the four restrictions placed on plaintiff, but maintained the overhead-work and ladder-climbing restrictions based on plaintiff's opioid use and weaning-off period. (Dkt. 33-5 at 44.) Further, Dr. Brewer stated that plaintiff was "able to work without restrictions from a physical perspective." (Dkt. 33-5 at 42.) The restriction also noted that plaintiff should be re-

evaluated in three to four months to determine whether he had been weaned from the opioids. (Id.) The updated restrictions were passed along to Ternan, who determined that plaintiff could not, at that time, be placed in the apprentice position. Rob Shaver, a manager at Van Dyke, approved Ternan's decision to bypass plaintiff for the position. This was a temporary bypass, and plaintiff could reapply again in three to four months.

Plaintiff did not seek review of his restrictions by defendant until September 2013. On September 11, 2013, Dr. Kole concluded that plaintiff had been successfully weaned off of pain medication. (Dkt. 33-7 at 8-9.)

Plaintiff filed suit on November 25, 2013. He brings claims for disability discrimination under the Americans with Disabilities Act ("ADA"), Michigan's Persons With Disabilities Civil Rights Act ("PWDCRA"), and the FMLA.

II.   Legal Standard

Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court may

6

not grant summary judgment if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248.  The Court "views the evidence, all facts, and any inferences that may be drawn from the facts in the light most favorable to the nonmoving party." *Pure Tech Sys., Inc. v. Mt. Hawley Ins. Co.*, 95 F. App'x 132, 135 (6th Cir. 2004) (citing *Skousen v. Brighton High Sch.*, 305 F.3d 520, 526 (6th Cir.2002)).

III.   Analysis

A. Applicable ADA *Prima Facie* Standard

Defendant argues that plaintiff has failed to make a *prima facie* case of discrimination under the Americans with Disability Act.   In the Sixth Circuit, there is some conflict on which standard applies to a *prima facie* case of discrimination under the ADA.[1]

In *Whitfield v. Tennessee*, the Sixth Circuit attempted to resolve "confusion in this circuit as to the proper test for establishing a *prima*

---

[1] Plaintiff also brings a claim for disability discrimination under the PWDCRA.   The PWDCRA "substantially mirrors the ADA, and resolution of a plaintiff's ADA claim will generally . . . resolve the plaintiff's PWDCRA claim." *Cotter v. Ajilon Servs., Inc.*, 287 F.3d 593, 597 (6th Cir. 2002).   Accordingly, the Court will analyze plaintiff's PWDCRA claim under the applicable ADA standards.

7

*facie* case of employment discrimination under the ADA." *Whitfield*, 639 F.3d 253, 259 (6th Cir. 2011).

Two alternate tests had been used to that point. The first was a three-factor test that required a plaintiff to show: "(1) that he or she is an individual with a disability; (2) who was otherwise qualified to perform a job's requirements, with or without reasonable accommodation, and (3) who [suffered an adverse employment action] solely by reason of the disability." *Id.* (citing *Mahon v. Crowell*, 295 F.3d 585, 589 (6th Cir. 2002). The second was a five-factor test that required a plaintiff to show that: "(1) he or she is disabled; (2) otherwise qualified for the position, with or without reasonable accommodation; (3) suffered an adverse employment decision; (4) the employer knew or had reason to know of the plaintiff's disability; and (5) the position remained open while the employer sought other applicants or the disabled individual was replaced." *Id.* (citing *Macy v. Hopkins Cnty. Sch. Bd. Of Educ.*, 484 F.3d 357, 365 (6th Cir. 2007)).

The two tests differ primarily in that the three-factor test requires the disability to be the but-for cause of the discriminatory employment

decision, and the five-factor test does not.   The *Whitfield* court determined that the five-factor test was the correct test.   *Id*.

However, the Sixth Circuit has more recently stated that *Whitfield* only applied to the establishment of a "*prima facie* case of discrimination through indirect evidence[.]"   *White v. Standard Ins. Co.*, 529 Fed. Appx. 547, 549 (6th Cir. 2013); *see also Becker v. Elmwood Local Sch. Dist.*, 519 Fed. Appx. 339, 342 (6th Cir. 2013).

In the past year, the Sixth Circuit has indicated that the three-factor *prima facie* test rejected by *Whitfield* in 2011 is the correct test to apply to cases involving both direct and indirect evidence of discrimination.   *Demyanovich v. Cadon Plating & Coatings, L.L.C.*, 747 F.3d 419, 433 (6th Cir. 2014); *see also Blazek v. City of Lakewood, Ohio*, 576 Fed. App'x 512, 516 (6th Cir. 2014) (applying the three-factor test "[i]n the absence of direct evidence of discrimination").

To clarify this conflict, the Court asked the parties to submit supplemental briefing on which of the two standards applied.  (Dkt. 40.) The parties submitted their briefing on February 17, 2015.  (Dkts. 42, 43.)  The parties agree that this is a direct evidence case.  (*See* Dkt. 42

at 4 ("This case should be viewed as a direct-evidence case."); Dkt. 43 at

2 ("This [case] involves 'direct' evidence . . .").)[2]

Upon consideration of the parties' briefing and review of Sixth Circuit precedent, the Court will apply the three-factor *Demyanovich* test in this case. In both *White* and *Becker*, the Sixth Circuit limited the five-factor test endorsed in *Whitfield* to indirect evidence cases. This was based in no small part on the fact that the *Whitfield* court explicitly stated that the five-factor test applied to "a *prima facie* case of employment discrimination [made] through indirect evidence[.]" *Whitfield*, 639 F.3d at 258-59. Following *Demyanovich* and *Blazek*, however, the Sixth Circuit appears to have also abandoned the five-factor test for indirect evidence claims.[3]

---

[2] Plaintiff argues in the alternative that he can also succeed based on the indirect evidence standard. (Dkt. 42 at 10-11.)

[3] On October 17, 2014, the Sixth Circuit issued *O'Brien v. Mich. Dept. of Corrections*, 2014 WL 7533852 (6th Cir. Oct. 17, 2014), which stated that the three-factor test was the proper *prima facie* test to apply to all ADA claims. *Id*., at *5. On November 21, 2014, the Sixth Circuit issued *Judge v. Landscape Forms, Inc.*, 2014 WL 6610470 (6th Cir. Nov. 21, 2014), which stated that the five-factor test was the proper *prima facie* test to apply to all ADA claims. *Id*., at *3. The cases addressed neither the other cases from this Circuit holding otherwise, nor the distinction between direct and indirect evidence cases.

Accordingly, the Court will determine whether plaintiff has shown that (1) he is disabled, (2) he is otherwise qualified to perform the essential functions of the RMI position, with or without accommodation, and (3) he suffered an adverse employment action because of his disability. *Demyanovich*, 747 F.3d at 433.

### B. Plaintiff's Disability

Under the ADA, "[t]he term "disability" means, with respect to an individual—

> (A) a physical or mental impairment that substantially limits one or more major life activities of such individual;
> (B) a record of such an impairment; or
> (C) being regarded as having such an impairment (as described in paragraph (3))."

42 U.S.C. § 12102(1).

Plaintiff's alleged disability is his neck injury dating from 2000, and he argues that he qualifies as disabled under all three definitions.

In 2012 and early 2013, plaintiff's neck injury did not constitute a physical impairment that substantially limited one or more major life activities. Plaintiff's consistent stance both at the time he applied and in his brief is that he had *no* limitations based on his neck injury in January and February of 2013, which is why he argues he had no

11

limitations preventing him from taking the RMI position. (*See* Dkt. 36 at 10 ("[N]o other doctor who evaluated Mr. Ferrari during this period believed he needed physical restrictions[.]"); Id. at 11 ("All told . . . five separate people authorize[ed] Mr. Ferrari to work without restrictions[.]"; Id. at 24 ("Mr. Ferrari could perform the essential functions of his job without accommodation[.]" (citing Dkts. 36-11, 36-15)).

Plaintiff also argues that he was disabled at the time he applied for the RMI position because, at his April 10, 2014 deposition, he stated that his neck injury was currently causing him problems with his sleep. (Dkt. 36-2 at 11.)[4]  The relevant time period for determining whether a plaintiff was disabled for the purposes of an employment discrimination claim is the time at which the adverse employment decision was made – in this case, February 2013.   Plaintiff was therefore not actually disabled at the time of the adverse employment decision.

---

[4] At his deposition on April 10, 2014, plaintiff was asked, "[R]ight now[,] [h]ow do your three herniated disks substantially limit any major life activity?"  (Dkt. 36-2 at 11.)  Plaintiff responded, "Sleeping is one of the big ones."  (Id.)  Neither the record nor plaintiff's brief indicate that sleeping was a problem for plaintiff at the time the employment decision was made in 2013.

12

Plaintiff was disabled with regard to his neck injury based on the record from 2000 until 2012. "An individual has a record of a disability if the individual has a history of, or has been misclassified as having, a mental or physical impairment that substantially limits one or more major life activities." 29 C.F.R. § 1620.2(k)(1). "An individual will be considered to have a record of a disability if the individual has a history of an impairment that *substantially limited* one or more major life activities when compared to most people in the general population, or was misclassified as having had such an impairment." 29 C.F.R. § 1620.2(k)(2).

Plaintiff's records demonstrate a history of a neck injury that substantially limited at least one major life activity. However, the record also shows unequivocally that plaintiff, his doctors, and defendant all regarded the neck-based disability as entirely resolved at the time the adverse employment decision was made.

Accordingly, plaintiff qualifies as disabled based on the record of his neck-based disability.[5]

_____

[5] Plaintiff also argues that he is disabled based on his neck injury because he was regarded as disabled beginning on December 6, 2012, when Dr. Brewer issued restrictions based on his neck injury. However,

Plaintiff does not contend that he is disabled under the ADA based on his opioid use, whether real or perceived.  However, defendant's argument focuses on the fact that a disability claim more logically arises from the opioid use.  This is so because it was the opioid use that served as the stated basis for defendant's adverse employment decision.

Plaintiff's opioid use cannot serve as the basis for an actual disability, as there is no evidence that it resulted in a substantial limitation on a major life activity.  However, "drug-addicted individuals can be shown to have a record of or [be] regarded as having a disability."  *MX Group, Inc. v. City of Covington*, 293 F.3d 326, 339 (6th Cir. 2002) (further citation omitted).

There is no record of plaintiff's opioid use having constituted a disability in the past.  Accordingly, plaintiff would only qualify as

---

in her February 27, 2013 report, Dr. Brewer clearly stated that plaintiff had no physical limitations related to his neck injury, and instead maintained two of the four previous restrictions based solely on his opioid use, for a period of three to four months.  There is no indication that, when the adverse employment decision was made, defendant regarded plaintiff as disabled based on his neck injury.

Further, even if defendant had regarded plaintiff as disabled, the actual duration of the period where defendant did so was less than three months, rendering the disability transitory under 42 U.S.C. § 12102(3)(B).

disabled based on his opioid use if he was regarded as disabled by defendant, and the disability lasted more than six months.

"An individual meets the requirement of "being regarded as having such an impairment" if the individual establishes that he or she has been subjected to an action prohibited under this chapter because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity."  42 U.S.C. § 12102(3)(A).  "Paragraph (1)(C) shall not apply to impairments that are transitory and minor. A transitory impairment is an impairment with an actual or expected duration of 6 months or less." 42 U.S.C. § 12102(3)(B).

Even if the opioid use constituted an impairment, plaintiff could not have been regarded as being disabled based on the opioid use under the ADA, because the impairment was transitory.   Dr. Brewer's restrictions were to last only three to four months based on Dr. Kone's report that plaintiff could be weaned from the opioids in that period of time.  After that period, Dr. Brewer and defendant expected that the restrictions would be able to be lifted.

In the Sixth Circuit, the expectation of the doctor putting the restrictions in place may determine whether an impairment is transitory. *See White v. Interstate Distributor Co.*, 438 Fed. Appx. 415, 420 (6th Cir. 2011) (holding that a doctor's expectation that restrictions would only be in effect for a month or two raised "no question that [plaintiff's] impairments are transitory"). Here, as in *White*, Dr. Brewer's expectation raises no question that the impairment in question was transitory. Plaintiff's delay in having the restrictions lifted cannot change that determination, as the "regarded as" prong focuses only on the *defendant's* belief, not the plaintiff's actions in response to that belief.

Accordingly, plaintiff has fulfilled the first prong of the three-factor test by showing that he was disabled under the ADA, based on the record of his neck-based disability, but not based on his opioid use.

### C. Plaintiff's Qualifications to Perform the RMI Job's Requirements, With or Without Accommodation

Defendant argues that plaintiff was not qualified to perform the requirements of the RMI job. It bases this on the examinations performed by both Dr. Brewer and Dr. Friedman.

16

An employer may, in certain circumstances, rely on the results of a medical examination to determine that a person cannot perform the essential functions of a position for purposes of the ADA. *See Wurzel v. Whirlpool Corp.*, 482 Fed. App'x 1, 15 (6th Cir. 2012); *Gruener v. Ohio Cas. Ins. Co.*, 510 F.3d 661, 665 (6th Cir. 2008). Specifically, the ADA "mandates an individualized inquiry in determining whether an employee's disability or other condition disqualifies him from a particular position." *Holiday v. City of Chattanooga*, 206 F.3d 637, 643 (6th Cir. 2000).

An individualized inquiry is one that focuses on "the individual's actual medical condition, and the impact, if any, the condition might have on that individual's ability to perform the job in question." *Id*. An inquiry meets this requirement if the examining doctor is familiar with the relevant job duties, obtains individualized information about the employee's medical condition, has current knowledge of the employee's medical condition, examines the employee in person, and reviews the records of the employee's other treating physicians.

Plaintiff does not dispute that Drs. Brewer and Friedman had access to the records of his treating physicians, each examined plaintiff

in person, and both obtained a great deal of individualized information. Instead, plaintiff argues that the IME was "vague," and that defendant was obligated to send him in for drug or psychiatric testing. Plaintiff argues that even performing the individualized inquiry may insufficient, citing *Anderson v. GM, LLC*, 2014 WL 4494324 (E.D. Mich. Sept. 12, 2014). However, in *Anderson*, that doctor issued restrictions based solely on third-party assessments, coupled with a roughly five-minute exam. *Id.* at *3, 10. Here, defendant conducted two in-person examinations of plaintiff, and evaluated the medical records plaintiff provided to defendant.

Plaintiff also cites *Lafata v. Dearborn Heights Sch. Dist. No. 7*, 2013 WL 6500068 (E.D. Mich. Dec. 11, 2013). There, a school district was found to have conducted an insufficient inquiry where its doctor conducted only a "cursory physical examination of Plaintiff" and where there was contradictory information concerning that plaintiff's disability that the school district did not consider. *Id.* at *10.

Here, the only material question is whether defendant's doctors considered the information in front of them, including the medical records plaintiff provided, in making the determination that plaintiff

required restrictions.  Dr. Kole's February 7, 2013 letter stated that plaintiff could physically perform the duties in the RMI position description, but would require three months to be weaned off his pain medications. (Dkt. 36-15.)  Dr. Friedman's January 29, 2013 IME shows a close review of the records plaintiff provided, with the recommendation that plaintiff be restricted based on his opioid use and the potential for that use to impact his performance.  (Dkt. 37-5, at 10.)

First, Dr. Friedman's IME was conducted before Dr. Kole's letter, so only Dr. Brewer's final assessment could have incorporated the letter.  Dr. Brewer's final assessment did so.  (Dkt. 33-5 at 42.)  Second, the record put before Drs. Brewer and Friedman concerned almost exclusively plaintiff's physical ability to do the job, rather than the effect of his opioid use on his ability to do his job.  The only part of the record that explicitly evaluates plaintiff's opioid use, Dr. Kole's letter, states that plaintiff still required another three to four months to be weaned off the pain medication.

Both Dr. Brewer and Dr. Friedman agreed with plaintiff's doctors that plaintiff had no physical limitations based on his neck injury. However, the medical records that plaintiff provided included a

19

prescription for opioids filled on December 19, 2012, and still in his possession through February 27, 2013, when the adverse employment decision was made; a January 7, 2013 chart entry from plaintiff's family physician stating that plaintiff was still actively using opioids; and a February 7, 2013 letter from plaintiff's treating physician stating that plaintiff still needed three or four months to be weaned off of the opioids. Dr. Brewer and Dr. Friedman reasonably determined that plaintiff was still either actively on opioids or in the process of weaning himself off of them based on their individualized inquiries, and as a result, they placed restrictions on plaintiff related to the opioid use and weaning process.

Further, plaintiff points to no part of the record that would contradict Dr. Brewer and Dr. Friedman's reliance on Dr. Kone's statement that plaintiff still needed three or four months to be weaned off of the opioids. The only statement that would contradict Dr. Kone's letter would be plaintiff's own statements that he had weaned himself off of opioids at some point prior to applying for the RMI job.

Plaintiff told Dr. Brewer on January 16, 2013, that he had weaned himself off of opioids a month prior to that evaluation, and Dr.

20

Friedman on January 29, 2013, that he had weaned himself off of opioids three months prior.  However, the medical evidence plaintiff provided uniformly stated otherwise.  Plaintiff's statement that he had weaned himself off of opioids is insufficient to establish a genuine issue of material fact when the medical records plaintiff himself provided contradicted that statement.

Plaintiff cannot both argue that defendant should have fully considered the medical records plaintiff provided *and* that defendant should have disregarded them entirely when it was convenient for plaintiff.  Whether plaintiff in good faith believed that he had weaned himself off of opioids, or was dishonestly representing that he had done so in order to make himself eligible for the RMI position, the purpose of an individualized medical inquiry is for the employer to inquire "into the individual's *actual* medical condition, and the impact, if any, the condition might have on that individual's ability to perform the job in question."  *Holiday*, 206 F.3d at 643 (emphasis added).  That inquiry is not satisfied when an employer relies solely on the statement of the employee that he has no limitations, nor should the inquiry be deemed insufficient when medical records uniformly show that the employee's

21

*actual* medical condition is something other than what the employee believes it is or wishes it to be.

Defendant satisfied the individualized inquiry requirement of the ADA when it determined that plaintiff was not qualified to perform the functions of the RMI job until he had been fully weaned off of opioids.

### D. Reasonable Accommodation

Plaintiff argues that he could have been reasonably accommodated even with the ladder-climbing and overhead-work restrictions placed on him, because he could have alerted defendant on the days he was using opioids and been restricted from the relevant essential functions on those days. Because he would be accompanied by a journeyman during his training, plaintiff argues that the journeyman could have performed those functions in his stead on days where he was taking opioids. Further, plaintiff points to the testimony of Ternan, the RMI supervisor, who stated that plaintiff could have been accommodated for up to a week in terms of a ladder-climbing limitation. (Dkt. 36-9 at 5.)

Defendant contends, and plaintiff does not dispute, that ladder climbing was an essential function of the RMI position. Under the

22

ADA, a reasonable accommodation may include "job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities." 42 U.S.C. § 12111(9)(B). Plaintiff's proposed accommodation does not fall within the realm of "reasonable accommodation."

First, plaintiff's position in this case is that he was not only weaned off opioids, but that he had no reason to use them. He then raises the proposition that he might have still wanted to use opioids "at night after a hard day's work" or "every few days because of pain." (Dkt. 36 at 28.) That is defendant's exact concern – that plaintiff, despite having no physical need to use opioids, had not yet weaned himself from a dependence on them.

Second, "the ADA does not require employers to accommodate individuals by shifting an essential job function onto others." *Hoskins v. Oakland Cnty. Sheriff's Dept.*, 227 F.3d 719, 729 (6th Cir. 2000).

Plaintiff's only identified accommodation is precisely that – shifting the essential function of ladder climbing on to his supervisor.

Finally, plaintiff relies on 29 C.F.R. 1630.2(k)(3), which states that a person with a record of a disability "may be entitled, absent undue hardship, to a reasonable accommodation if needed and related to the past disability." Plaintiff has not shown that restrictions based on his being weaned off opioids are or could be related to his record of a neck injury. Nor has he shown that indefinitely changing the essential functions of a job constitutes a reasonable accommodation under the ADA.

### E. Plaintiff Suffering an Adverse Employment Action Because of His Disability

Under this prong, "[t]he plaintiff's disability must be a 'but for' cause of the adverse employment action." *Demyanovich*, 747 F.3d at 433 (citing *Lewis v. Humboldt Acquisition Corp.*, 681 F.3d 312, 321 (6th Cir. 2012)). Under that standard, it is not enough that the disability be a "motivating factor." *Lewis*, 681 F.3d at 321.

Here, the record can lead to only one reasonable conclusion: that defendant believed plaintiff had no restrictions based on the neck injury and was entirely capable of performing the physical functions of the

24

RMI job.   Instead, defendant was worried solely about plaintiff's potential continued opioid use.

The record shows that defendant did not consider plaintiff to have any restrictions or limitations related to his neck injury.   Both Dr. Brewer and Dr. Friedman stated unequivocally, in accord with the evaluations of plaintiff's doctors, that plaintiff's neck injury had resolved and presented no impediment to his taking the job.   Instead, both doctors refused to clear plaintiff for work based solely on his potential continued opioid use.   In fact, defendant's employees, including Dr. Brewer, engaged in fairly extensive efforts to prevent plaintiff from being cleared to take the RMI job based on his opioid use. Dr. Brewer worked with Ford management employees to ensure that plaintiff would not have time to go to Dr. Kone and be taken off of the prescription opioids so as to be able to claim that defendant should lift the opioid-based restrictions.

Plaintiff argues that his opioid use could only be a concern if defendant believed plaintiff was still injured, because the opioid use was "required" for the injury.   Because the injury had resolved, there was no need for plaintiff to take opioids; further, plaintiff claims that he

weaned himself off of opioids in or around December 2012, and so defendant could have no legitimate concern about opioid use. Plaintiff's argument begs the question of defendant's belief that he still had a neck injury that limited his ability to perform the job.

Defendant was concerned with plaintiff's apparent continued use of or weaning from prescription opioids despite the resolution of the underlying injury for which the opioids were prescribed, based on plaintiff's medical records and the statement of his treating physician. Prescription opioids carry with them a significant risk of addiction, as well as potentially lengthy and/or difficult withdrawal symptoms. It is entirely possible for concerns about addiction or withdrawal resulting from long-term use of opioids to be separate from concerns about the underlying condition that resulted in the use of the opioids to begin with. This is particularly so where, as here, the underlying condition requiring an opioid prescription was resolved, and there was no medical need to continue using the drug.

Plaintiff attempts to raise a question of fact as to causation based on the restrictions Dr. Brewer placed on him when he returned from FMLA leave on December 3, 2012. On December 6, 2012, Dr. Brewer

26

placed four restrictions on his work, all relating to his neck injury. At the time, plaintiff mentioned that he wanted the restrictions lifted in case a skilled trades position came open. This, however, is insufficient to establish that his neck-based disability was the "but for" cause of the February 27, 2013 employment decision.

The restrictions Dr. Brewer placed on plaintiff on December 6, 2012 based on his neck injury were, in effect, entirely lifted on February 27, 2013, when she stated that plaintiff had no physical restrictions based on his neck injury. On February 27, 2013, Dr. Brewer put in place two restrictions that were identical to two restrictions she placed on December 6, 2012, but for a different reason entirely: plaintiff's opioid use and the resultant weaning process, not his neck injury.

Defendant's adverse employment action on February 27, 2013 did not rely in any way on plaintiff's neck injury. In fact, but for defendant's concerns about plaintiff's continued opioid use and weaning process, plaintiff would have been fully cleared to take the RMI job notwithstanding his prior neck injury. That plaintiff began using the opioids because of the neck injury does not make the neck injury the but for cause of the adverse employment action because the neck injury

27

was, by every indication in the record, of no consequence in the placing of restrictions on plaintiff that temporarily prevented him from taking the RMI job on February 27, 2013.

For these reasons, plaintiff has failed to make a *prima facie* case of disability discrimination under the ADA, and his ADA and PWDCRA claims are dismissed.

### F. FMLA Retaliation

"To establish a *prima facie* case of retaliation under the FMLA, [a plaintiff] must show that: (1) he was engaged in a statutorily protected activity; (2) [the defendant] knew that he was exercising his FMLA rights; (3) he suffered an adverse employment action; and (4) a causal connection existed between the protected FMLA activity and the adverse employment action." *Seeger v. Cincinnati Bell Tel. Co., LLC*, 681 F.3d 274, 283 (6th Cir. 2012) (further citation omitted).

Defendant's claim concerns his five-month psychiatric leave in 2012. However, plaintiff makes no argument that anyone at the Van Dyke plant where he applied knew about or acted on his FMLA leave. Plaintiff alleges that his requests for FMLA leave were in his personnel file, that Dr. Brewer knew he had taken some form of leave when

placing new restrictions on him on December 6, 2012, and that a labor relations representative was involved in the process of placing restrictions based on his opioid use sometime in January or February.

Plaintiff never states that he discussed FMLA leave with Dr. Brewer. Plaintiff never states that he discussed FMLA leave with any decision-maker involved in this process. Plaintiff has likewise failed to raise any issue of material fact beyond bare speculation that anyone involved in the decision-making process for the RMI job knew about his FMLA leave or based the February 27, 2013 adverse employment decision on his FMLA leave. Plaintiff has failed to establish a *prima facie* case of FMLA retaliation.

Accordingly, plaintiff's FMLA retaliation claim is dismissed.

IV.   Conclusion

For the reasons stated above, it is hereby ordered that:

Defendant's motion for summary judgment (Dkt. 33) is GRANTED; and

Plaintiff's complaint is DISMISSED WITH PREDJUDICE.

IT IS SO ORDERED.

Dated: March 27, 2015                    s/Judith E. Levy
Ann Arbor, Michigan                      JUDITH E. LEVY

United States District Judge

## **CERTIFICATE OF SERVICE**

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on March 27, 2015.


s/Felicia M. Moses
FELICIA M. MOSES
Case Manager